**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **NATALIE HENSHILWOOD,** | § | |
| **SHAWN JONES, AND** | § | |
| **PRIME TITLE AGENCY, INC.** | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | **Civil Action No.: 4:25-cv-01926** |
| **V.** | § | |
| | § | |
| **JP MORGAN CHASE BANK,** | § | |
| **NATIONAL ASSOCIATION,** | § | |
| | § | |
| *Defendants*. | § | |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

Plaintiffs Natalie Henshilwood ("Henshilwood"), Shawn Jones ("Jones"), and Prime Title Agency, Inc. ("Prime," and with Henshilwood and Jones, collectively, "Plaintiffs"), by and through their undersigned counsel, file this Second Amended Complaint against Defendant JPMorgan Chase Bank, National Association ("Chase" or "Defendant"), and allege as follows:

## I. INTRODUCTION

1.     This case arises from Chase's systematic failure to follow its own account agreements, banking regulations, and industry standards when it allowed a third party—Veronica Corona—to use Chase's banking systems against its own, long-time customers. Despite Corona being merely an authorized signer on certain accounts, Chase accepted without adequate verification her false claim to be the sole owner of Dash Title Corp. (that like all Texas corporations, can only transfer equity through a Board resolution and a transfer/purchase agreement transferring the stock), allowed her to initiate unauthorized reversals and withdrawals believed to total over $100,000 from Plaintiffs' accounts, and closed accounts of businesses with which Corona had no connection

whatsoever.  Despite Plaintiffs' repeated attempts to set the record straight, Chase chose instead—contrary to its duties and obligations under contract and law—to accept Corona's unsubstantiated claims and systematically destroyed Plaintiffs' finances.

## II. PARTIES

2.      Plaintiff Natalie Henshilwood is an individual and citizen of Texas, residing in Harris County, Texas. Ms. Henshilwood is a co-founder and equity owner of Dash Title Corp., a Texas corporation, and at all relevant times was an authorized signer on Dash Title Corp.'s business bank accounts at Chase. She also is the sole or majority owner of Plaintiff Prime Title Agency, Inc. and maintained personal bank accounts with Chase.

3.      Plaintiff Shawn Jones is an individual and citizen of Texas, residing in Harris County, Texas. Mr. Jones is a co-founder of Dash Title Corp. and was, at all relevant times, an authorized signer on Dash Title Corp.'s Chase accounts and a participant in its business operations.

4.      Plaintiff Prime Title Agency, Inc. is a Texas corporation with its principal place of business in Harris County, Texas. Prime Title maintained business bank accounts with Chase, and its principals include Ms. Henshilwood. Prime Title's account agreements and resolutions on file with Chase designated Ms. Henshilwood as authorized to transact on its accounts.

5.      Defendant JPMorgan Chase Bank, National Association is a national banking association organized under the laws of the United States, with its main office in Columbus, Ohio, and conducting substantial business operations in this District.

## III. JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) based on Plaintiffs' claims under the Electronic Fund Transfer Act, 15 U.S.C. § 1693 et seq.

7. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) as they form part of the same case or controversy.

8. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) (diversity jurisdiction) as the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District, and Defendant conducts substantial business in this District.

## IV. FACTUAL ALLEGATIONS

### A. The Banking Relationships and Account Agreements

10. Ms. Henshilwood and Mr. Jones co-founded Dash Title Corp., which maintained its operating and escrow accounts and a business credit card account with Chase. Upon opening Dash Title Corp.'s accounts on or about February 2023, the company executed a Business Banking Resolution and Signature Card with Chase. That document listed Ms. Henshilwood, Mr. Jones, and one Veronica B. Corona as persons authorized to transact business on Dash Title Corp.'s accounts.

11. In addition to the Dash Title Corp. accounts, Ms. Henshilwood is the owner and president of Plaintiff Prime Title Agency, Inc., which also held business accounts at Chase. Ms.

Henshilwood was the authorized signatory on Prime Title's accounts pursuant to account opening documents signed by Chase. Plaintiffs Henshilwood and Jones also each maintained personal checking accounts with Chase. These various accounts (personal and business) were part of Plaintiffs' overall banking relationship with Chase and were often managed together as part of Chase's services to Plaintiffs.

12.     Prior to the events described below, Plaintiffs had an exemplary history with Chase, with no incidents of fraud or account misuse.

13.     Plaintiffs maintained multiple accounts with Chase:

- **Natalie Henshilwood and Shawn Jones:** Personal accounts including Chase Private Client Account ****6963.  They were designated as Chase Private Clients, reflecting the their substantial deposits and banking activity.

- **Prime Title Agency, Inc.:** Business accounts ****7831 and ****2099 (Prime Title is wholly owned by Plaintiffs Henshilwood and Jones)

- **Dash Title Corp.:** Business accounts ****1298 and ****5682 (in which Plaintiff Henshilwood maintains an ownership interest and both Henshilwood and Jones were authorized signers)

14.     These accounts were governed by written account agreements including but not limited to Chase's Deposit Account Agreement and related documents (collectively, the "Account Agreements"), which constitute binding contracts.

15.     The Account Agreements set forth specific rights, duties, and procedures governing the accounts, including:

- a.  Requirements for verifying the identity and authority of persons seeking to access or modify accounts;

- b.  Procedures for investigating and resolving disputed transactions;

- c.  Limitations on Chase's right to debit accounts or reverse transactions;

- d.  Notice requirements for account actions; and

- e.  Chase's duty to exercise ordinary care in handling customer accounts.

16.     Specifically, the Account Agreements provide that for business accounts, Chase must rely on the account's governing documents and signature cards to determine authorized signers and that changes to account ownership or control require proper documentation pursuant to the business entity's governing documents.

**B.    The Dash Title Corp. Ownership Structure and Corona's Limited Authority**

17.     Dash Title Corp. is a Texas corporation in which Plaintiff Henshilwood owns a substantial ownership interest. The corporation's bylaws, dated and executed prior to the events at issue, specifically require:

  a.  Certificated securities for all ownership interests (Article 7.2);

  b.  Physical stock certificates to be issued only after full payment (Article 7.2);

  c.  Written documentation and endorsement for any share transfer (Article 7.3);

  d.  Presentation of transfer documents to the Corporate Secretary (Article 7.3);

  e.  Cancellation of old certificates and issuance of new certificates for any ownership change (Article 7.3).

18.     Veronica Corona, Shawn Jones, and Natalie Henshilwood were authorized signers on Dash Title Corp.'s accounts, with Corona listed as "Vice President" and Henshilwood listed as "President."

19.     No stock transfer agreement, bill of sale, or purchase agreement transferring Henshilwood's ownership interest to Corona was ever executed. No stock certificates were ever endorsed, transferred, or cancelled as required by the bylaws. No new certificates were ever issued to Corona evidencing sole ownership.  No formal ownership transfer was formally effected.

20.     On information and belief, in mid-August 2024, Corona apparently presented to Chase one or more corporate resolutions, claiming to now be a sole owner.  Any resolution she presented would have referenced a "term sheet" that explicitly stated it would terminate 30 days from August

9, 2024, if a purchase agreement was not executed by September 8, 2024. Further, any resolution she might have presented would have had no discussion of the number of shares transferred, the number of shares outstanding, or anything of the sort—because no transaction actually occurred—and would have been wholly inadequate to show actual equity/stock transfer between owners of a Texas corporation. No purchase agreement or transfer agreement with Plaintiffs Henshilwood or Jones as parties was ever executed or even presented for review or signature to Plaintiffs.

21.     Presumably, Chase did not ask for the term sheet. If it had, it would have learned that no purchase agreement had been executed and there was no formal ownership transfer. It would have also seen that the term sheet was not binding and would expire by its own terms if no purchase agreement was entered into.

22.     Chase also should have known that a "term sheet" as commonly known in the industry is a preliminary document and never memorializes a final deal. Chase did not ask Henshilwood or Jones about the document(s) presented by Corona. It should have asked why Jones, still a corporate officer with Dash Title Corp. at the time, had not signed any document or resolution, especially when his equity ownership was referenced. It should have asked for a board resolution and asked why the number of shares transferred was not listed nor the total number of outstanding shares (and other questions as well). It should have asked for a transfer agreement or purchase agreement signed by Corona and Henshilwood or even a stock assignment. No purchase agreement was ever executed, and the term sheet expired by its own terms.

23.     No transfer of ownership of Dash Title Corp. ever occurred. Ms. Henshilwood remained an owner of Dash Title Corp. under the corporation's bylaws, which require formal, written stock transfer instruments and corporate approvals for any ownership change. No stock transfer agreement, purchase-and-sale contract, or other definitive document was ever executed to

transfer Ms. Henshilwood's interest to Corona.  Any preliminary "term sheet" or proposal that Corona may have had was expressly contingent on a future purchase agreement that never materialized and, by its own terms, eventually expired.[1] At most, on information and belief, Corona may have presented a resolution about an inchoate transaction that was never completed with none of the usual required transfer agreements, certificates, or evidence of equity transfer for a Texas corporation.  Any such resolution that she might have presented was invalid to transfer the stock of this Texas corporation and would not have even listed the class of stock, number of shares transferred, and the number of shares outstanding.

24.    While a limited liability company may transfer equity through a mere corporate resolution, a Texas corporation like Dash Title Corp. <u>cannot</u> do so and would require a resolution of the board <u>plus</u> a mechanism of transfer itself.  Thus, Corona's assertion of sole ownership was unfounded and not supported.  Chase surely was aware of the basic requirements to transfer equity of a Texas corporation.

25.    On information and belief, the individuals identified on the account signature card remain authorized signers until Chase receives proper written revocation of authority. Plaintiffs never provided any written revocation of their own authority on the Dash Title Corp. accounts, nor did they ever consent to any change removing Ms. Henshilwood or Mr. Jones.

26.    Chase also entered into other agreements with Plaintiff that, on information and belief, required the account holder to notify the bank of any change in ownership or authorized signers.

---

[1] In fact, the term sheet at issue was entitled "TERM SHEET - Terms for Member Buyout Purchase Agreement" dated August 9, 2024".  In partially pertinent part, it included the following provisions: "***Purchase Agreement:*** Parties will enter into a binding Purchase Agreement"; "***Expiration:*** This term sheet, and any associated negotiations, will expire when the Parties have executed the Purchase Agreement or in 30 days, whichever is first."; "***No Binding Agreement:*** This Term Sheet . . . shall not give rise to any legally binding or enforceable obligation of any party except with regards to [certain inapplicable sections]."  Jones was not even a party to the Term Sheet.

27.    Without contacting or notifying Ms. Henshilwood or Mr. Jones, and without obtaining any of the critical evidence a prudent bank would require for a Texas corporation (such as proof of stock ownership transfer and a formal Board resolution bearing the signatures of the directors, each listing the basic attributes of stock transfer such as number of shares, class of stock, number of shares outstanding—this was a business banking account after all).  Instead, on information and belief, Chase accepted Corona's claims at face value that—at most—an inchoate transaction that was never completed (and lacked the most essential details for a valid Texas corporation stock transfer) was actually the genuine article.  On information and belief, when juxtaposed against all the efforts and information expended and provided by Plaintiffs who took great pains to show Chase that no transaction was completed, it was commercially unreasonable for Chase to continue to believe Corona and act on her authority.

28.    On information and belief, in mid-August 2024, without notice to Ms. Henshilwood or Mr. Jones, Chase apparently processed a change in its records to remove Ms. Henshilwood and Mr. Jones as authorized signers on the Dash Title Corp. accounts, effectively granting Corona exclusive control.

29.    To make matters more difficult for Plaintiffs, on information and belief, they have apparently been removed from the Dash Title Corp. accounts by Chase so they cannot "recover" any funds that Chase allegedly directed back to such accounts.

30.    On information and belief, contrary to the terms of agreements with Plaintiffs, Chase failed to provide timely/contemporaneous notice to Henshilwood and Jones that they had apparently been removed as authorized signers.  Instead, Chase eventually told them the accounts had been frozen due to an investigation and due to the investigation, could not tell them why the

accounts were frozen.   Additionally, on information and belief, Chase failed to provide any notice to Plaintiffs Henshilwood and Jones that they had been removed as authorized signers.

31.     Further, on information and belief, Corona and Dash Title Corp. failed to provide any timely/contemporaneous notice of any change removing Henshilwood or Jones as authorized parties because no such valid change ever occurred.

## C.  Chase's Failure to Verify Authority and Violation of Account Agreements

32.     On information and belief, apparently in mid-August 2024, Chase accepted Corona's claim of sole ownership—based, at most, on an inchoate transaction that was never completed and at most—a document that could not possibly be effective to transfer ownership of a Texas corporation, and began executing reversals of authorized transactions, withdrawing funds from accounts, clawing back funds from Plaintiffs' accounts inside and outside of Chase, apparently restricting Plaintiffs' account access while calling it "frozen accounts", apparently closing accounts, and denying Plaintiffs access to their own funds.

33.     On information and belief, Chase's actions in August 2024 (or thereabouts) were in violation of agreements and duties governing the accounts.

34.     Plaintiffs contend that Dash Title did not provide the required "written authorization" apparently revoking Plaintiffs'' access to the accounts. On information and belief, any such revocation needed to be authorized by the proper corporate decision-makers. Here, no legitimate revocation existed: Dash Title Corp.'s board or shareholders never approved removing Ms. Henshilwood or Mr. Jones. On information and belief, Chase nevertheless acted on Corona's instructions.  Corona could not have offered any stock certificates, formal transfer agreements, or corporate meeting minutes demonstrating that Corona had legitimately become sole owner or that Plaintiffs' authority had been revoked—because these do not exist; no transaction actually

occurred.  Apparently, Chase did not reach out to Jones, a Dash Title Corp. (a Dash Title Corp. account signatory at that time) or to Henshilwood (the long-established owner and also a Dash Title Corp. account signatory) to confirm Corona's assertions.  At most, on information and belief, Corona could have only presented a non-binding term sheet that would expire by its own terms and a resolution that was ineffective to transfer equity ownership of a Texas corporation.

35.    On their own initiative, after they experienced the reversals and on information and belief, after Chase had apparently taken action based on Corona's assertions, Henshilwood and Jones spent many hours at the Chase branch and over the phone with countless representatives providing documents and information about the situation.

36.    Plaintiffs contend that Chase's unilateral action in siding with Corona was a fundamental departure from reasonable banking practices and the protections owed to Plaintiffs under the agreements between the parties.  Plaintiffs understand that Chase will contend it could rely on Corona's presentation of a corporate resolution of Dash Title Corp., but this is simply not sufficient to satisfy Chase's obligations,[2] especially considering its obligations under the agreements, including its obligations to notify Plaintiffs and take into account information it received from Plaintiffs when it told them the accounts were frozen and began reversing transactions.  It is also insufficient because a Texas corporation cannot transfer equity through a "corporate resolution" alone; it needs a resolution of the corporation's board of directors plus an actual transfer agreement of the stock at issue.  Corona could have presented—at most—only an inchoate transaction that was begun but <u>never completed, closed, or consummated</u> and she could

---

[2] To be clear, Plaintiffs cannot know what documents and information Corona provided to Chase, but they do know that no actual, valid equity transfer occurred with respect to Dash Title Corp. because the non-binding term sheet detailing some of the terms of the contemplated equity transfer transaction, explicitly stated it would terminate 30 days from August 9, 2024, if a purchase agreement was not executed by September 8, 2024, and no purchase agreement was ever executed or even granted.  It seems manifestly absurd and unfair that Corona should somehow own a company when only a term sheet was signed and any other documents pertaining to authorizing the company to enter into the transaction did not transfer any equity—because the equity purchase transaction never actually occurred.

not have presented any Board of Directors resolution of Dash Title Corp. nor any transfer agreement or purchase agreement because none of those exist.

37.    Plaintiffs contend that Chase violated one or more agreements regarding the accounts at issue by (a) failing to properly verify Corona's claimed authority when making business modifications, (b) failing to properly verify Corona's claimed when making changes to signature authority, (c) processing reversals of transactions or debits without proper authorization because adjustments should have only been allowed for actual discrepancies or errors—and such transactions were neither, (d) failing to provide notice of adverse actions to Plaintiffs, including the apparent removal of Plaintiffs as signatories without notice, and (e) failing to investigate disputes within a reasonable amount of time or as required by the agreements.

**D.    Specific Unauthorized Transactions and Account Actions**

38.    Chase apparently removed Plaintiffs Jones and Henshilwood from the Dash Title Corp. accounts—but on information and belief, never provided any timely/contemporaneous notice of this removal to Plaintiffs.  In fact, on information and belief, Chase never provided any written notice that Plaintiffs Henshilwood and Jones had actually been removed as signatories to the Dash Title Corp. accounts. Instead, Chase allowed Plaintiffs to continue attempting transactions on the accounts, permitted them to spend hours at Chase branches and on phone calls attempting to resolve issues without ever disclosing they had apparently been removed, accepted transactions from Plaintiffs—which on information and belief occurred after their removal and then later reversed such transactions as a result, and concealed such material information from Plaintiffs while they attempted in good faith to complete legitimate business operations.

39.    As a direct result of Chase's acceptance of Corona's claims, on information and belief, Ms. Henshilwood and Mr. Jones began to suddenly lose all access to the Dash Title Corp. accounts

after mid-August 2024. They were locked out of online banking for those accounts, could not obtain information or transaction details in the ordinary course, and were effectively frozen out of their company's finances. Unbeknownst to them at the time, Corona was now able to direct transactions on the Dash Title Corp. accounts without their input, and on information and belief, Chase would treat any transactions initiated by Plaintiffs as unauthorized. On information and belief, this undisclosed change laid the groundwork for a series of unauthorized reversals and withdrawals that Chase subsequently conducted, compounding the harm to Plaintiffs. Plaintiffs did not discover the full extent of these account changes until after the fact, when transactions they initiated began to mysteriously reverse or when accounts were closed. Ms. Henshilwood or Mr. Jones now believe that Chase had removed them  as signatories and deemed their authority terminated without providing notice of these material, specific facts.

40.     Based solely on Corona's claims and as Plaintiffs contend—in violation of the agreements pertaining to the accounts, Chase executed the following specific unauthorized transactions:

41.     **Wire Transfer Reversal ($22,312.30):** On August 19, 2024, Plaintiffs properly initiated a wire transfer of $22,312.30 from Dash Title Corp. Account ****1298 to Henshilwood's Wells Fargo account ****1860. Chase accepted and processed this transaction. On August 21, 2024, after Wells Fargo had received and credited the funds, Chase improperly reversed this completed wire transfer.  On information and belief, this was due to Corona's claims and the undisclosed removal of Plaintiffs as signatories on the ****1298 account.  This transfer represented funds owed to Ms. Henshilwood (for example, a distribution or reimbursement) and was properly authorized at the time by the then-listed account signers. On information and belief, Chase allowed or facilitated a reach or claw back into Ms. Henshilwood's external Wells Fargo

account to pull back the $22,312.30, even though the funds had already been received by Wells Fargo and credited to Ms. Henshilwood. This reversal occurred without any notice or consent to Ms. Henshilwood, who suddenly found that $22,312.30 vanished from her personal account, depriving Ms. Henshilwood of her money. Chase effectively reached into a customer's outside account to claw back a completed transfer which Plaintiffs contend is contrary to standard banking finality rules.

42.     **September 27, 2024 Unauthorized Withdrawals ($62,298.20 total):** In the following weeks, Chase, executed a series of debits to Henshilwood's personal Chase checking account (Private Client account ending in 6963) that were not authorized by Ms. Henshilwood and had no legitimate basis.

      **a.**  Chase withdrew $31,127.52 from Plaintiffs' Chase Private Client Account ****6963 without Henshilwood's or Jones' permission or valid claim. This amount corresponded to a prior transfer that had been made from the Dash Title Corp. operating account (…1298) to Ms. Henshilwood's personal account on September 17, 2024 (a transfer which, at the time, was proper because Ms. Henshilwood was still, in fact, an owner of Dash Title Corp. and had conducted transactions on behalf of Dash Title Corp. for which she was reimbursing herself). This wrongful debit directly caused harm, as that $31,127.52 was earmarked by Ms. Henshilwood to pay a substantial federal tax obligation. Indeed, shortly before Chase took the money, Ms. Henshilwood had scheduled an IRS payment of approximately $16,000 from her Chase account. Because Chase suddenly and wrongfully removed $31,127.52 from the account, there were insufficient funds when the IRS attempted to collect the payment. As a result, on October 10, 2024, Ms. Henshilwood's approximately $16,000 IRS payment was rejected and returned for insufficient funds; a deeply distressing event that exposed her to potential penalties and enforcement action, all caused by Chase's improper interference.

      **b.**  Further, on information and belief, Chase allowed Corona's sister, Gladys Vasquez, to withdraw $31,170.68 on or about September 27, 2024, from the same account without verification of authority. The exact mechanism of this transaction is not yet fully known to Plaintiffs, but it appears that Corona, having gained sole control, enabled a transfer of $31,170.68 from Dash Title Corp.'s accounts for the benefit of herself or her affiliates. To the extent this transaction overdrew or affected balances, Chase later passed liability for this amount onto Ms. Henshilwood personally. In fact, as described below, Chase would later make yet another debit to Ms. Henshilwood's personal account in an attempt to recoup what it termed a "credit that wasn't owed" – which corresponds to this $31,170.68 removal. Thus,

through a convoluted series of maneuvers, Chase effectively made Ms. Henshilwood bear the loss of the $31,170.68 that Corona or her confederates withdrew.

**43.    "Second" $31,127.52 Debit on October 8, 2024:** After Ms. Henshilwood protested the above unauthorized debits, Chase initially reversed or credited back the $31,127.52 to her personal account (acknowledging, at least temporarily, the dispute). However, on or about October 8, 2024, Chase once again removed $31,127.52 from Ms. Henshilwood's account. In a letter dated October 8, 2024, Chase claimed that a prior credit "wasn't owed," indicating it had decided to reinstate the debit against her. This action was taken unilaterally, without resolving the underlying issue of Plaintiffs' authority. It appeared to be Chase's effort to finalize the removal of the funds that Corona had targeted. The timing of this second $31k withdrawal was disastrous: as noted, by October 8, 2024, Ms. Henshilwood's large IRS payment was pending, and due to Chase's action, that payment was returned unpaid on October 10, 2024. Chase's conduct thus directly caused financial damage and risk to Plaintiffs, interfering with their obligations to third parties.

**44.    Additional Unauthorized Debits (September–October 2024):** In the same period, Chase made several other reversals from Plaintiffs' accounts which Plaintiffs contend as improper, all stemming from Corona's claims regarding transactions between Dash Title Corp.'s accounts and Plaintiffs' accounts:

> **a.    September 30, 2024 Unauthorized Withdrawal ($807.00):** Chase debited $807.00 from Henshilwood's personal account (****6963) on or about September 30, 2024. This corresponded to a payment that had been made a week earlier (on September 23, 2024) from the Dash Title Corp. operating account (…1298) to pay the balance on the Dash Title Corp. business credit card (account ending in 1551). That payment on September 23 was a legitimate internal transfer between Dash Title Corp.'s accounts (an operating account paying a Dash Title Corp. credit card bill) and was authorized at the time. Nevertheless, Chase, after removing Plaintiffs from authority, treated the credit card payment as improper and reversed the $807 credit. Because the Dash Title Corp. operating account was by then restricted, Chase pulled the $807 from Ms. Henshilwood's personal account–effectively holding her personally liable for a company credit card payment that had already

been funded by company funds. Chase's own records (including a claim confirmation letter dated October 17, 2024) show that it reversed the $807 and debited Ms. Henshilwood's account to negate a "Chase Claim No. 204991456190001", which was the dispute initiated by Corona regarding that internal payment.

**b. October 3, 2024 Unauthorized Withdrawal ($1,407.27):** Chase debited $1,407.27 from Account ****6963 without explanation or authorization. Plaintiffs later deduced that this amount likely related to yet another Dash Title Corp. internal transaction or adjustment demanded by Corona. The $1,407.27 appears to mirror an amount Corona disputed (possibly fees or payments associated with Dash Title Corp.'s operations). Regardless of its origin, Chase had no legal basis to remove $1,407.27 from Ms. Henshilwood's personal funds. Doing so without explanation was inconsistent with any right of setoff or contractual provision – it was simply another instance of Chase obeying Corona's instructions to Plaintiffs' detriment.

**c. October 8, 2024 Unauthorized Withdrawals ($43,296.69 total):**

- Chase withdrew another $31,127.52 from Account ****6963, claiming a prior credit "wasn't owed."

- Chase withdrew $12,169.17 based on a legitimate internal payment between Dash Title Corp. accounts that Plaintiffs had authority to make. This sum corresponded to a payment that had been made within Dash Title Corp.'s accounts: specifically, Dash Title Corp.'s escrow account had paid $12,169.17 toward the Dash Title Corp. credit card (ending 1551) in late September 2024. That payment was likewise an internal company transaction legitimately applied to the credit card balance. After Corona's intervention, Chase treated it as unauthorized and initially gave a provisional credit of $12,169.17 back to the account on October 7, 2024 (notifying Plaintiffs of a claim number 344991479240001). But then, on October 25, 2024, Chase informed Plaintiffs it was <u>permanently debiting</u> that amount—and by then, it had already taken the $12,169.17 out of Ms. Henshilwood's personal account on October 8. In summary, Chase once more made Ms. Henshilwood personally absorb a business transaction loss, by unilaterally seizing $12,169.17 of her money. This maneuver was done without prior notice and as Plaintiffs contend, in violation of contractual rights.

**d. October 25, 2024:** $807.00 payment reversed after being made on September 23, 2024.

45.    **Closure of Accounts and Withholding of Prime Title Funds:** Chase closed all Prime Title Agency, Inc. accounts (****7831 and ****2099) despite Corona having no connection whatsoever to this separate entity. When it closed the account, Prime Title had a balance of

approximately $21,991.57. Rather than returning all funds, Chase arbitrarily withheld **$9,500.00** and sent Prime Title a cashier's check for only the remainder (about $12,491.57, which Prime Title received on or about November 19, 2024). Chase never provided an explanation to Plaintiffs as to why it retained, and continues to retain, $9,500.00 from Prime Title Agency Account ****7831.

46.    Henshilwood personally remained on the Dash Title Corp. office lease throughout 2024.  For reasons including Henshilwood remaining on the lease, she continued to receive mail for Dash Title Corp.  Even recently, she continues to receive calls from collection companies seeking payment from Dash Title Corp. for unpaid bills Dash Title Corp. did not pay after Chase apparently removed Plaintiffs Henshilwood and Jones from the Dash Title Corp. bank accounts.

### E.    Plaintiffs' Attempts to Resolve and Chase's Refusal to Investigate

47.    Between September 2024 and December 2024, Plaintiffs made numerous attempts to resolve these issues with Chase, including multiple in-person visits to Chase branches, dozens of hours of phone calls with Chase representatives, submission of information and documentation proving no actual ownership transfer occurred despite any information or document(s) Corona might have communicated to Chase, formal written notices of unauthorized transactions, and a comprehensive demand letter dated December 19, 2024, sent via facsimile, detailing all unauthorized transactions and demanding correction. Time and time again, they sought answers and on information and belief, explained that no ownership transaction had been consummated, which was true.  If Chase decided it would rely on any certain documents or information provided by Corona—which could not have shown any proper equity transfer for Texas corporation Dash Title Corp. and at the very most was an inchoate transaction that never closed—then it certainly had a duty to listen to the other signatories/owners who repeatedly told them that no transaction had occurred.

48.     Despite these efforts, on information and belief, Chase failed to conduct any meaningful investigation based on the information provided by Plaintiffs, refused to take into account/review Plaintiffs' information and/or documentation which provided the full story, apparently continued allowing Corona to control accounts, failed to respond substantively to the December 19, 2024 demand letter for 56 days, refused to restore Plaintiffs' access or return their funds, and never disclosed to Plaintiffs that they had been removed as signatories on the Dash Title Corp. accounts.

49.     All allegations regarding Chase's internal actions between August 2024 and October 2024 (and thereafter), and its motivations in later reversals, are made upon information and belief, as the details are within Chase's knowledge and records. Plaintiffs allege that Chase's failure to inform them of their apparent removal as signatories was a proximate cause of the damages that followed because it enabled Corona to orchestrate the above-described debits under a cloak of legitimacy.

### F.   <u>Summary of Unauthorized Transactions</u>

50.     In total, between August and October 2024, Chase removed or withheld well over $75,000 of Plaintiffs' funds through the specific transactions itemized above. These include but are not limited to, the following: the $22,312.30 wire reversal, the two $31,127.52 debits, the $31,170.68 withdrawal, the $807 reversal, the $1,407.27 debit, the $12,169.17 debit, and the $9,500 withheld from Prime Title.

51.     Each of these was done unilaterally by Chase, without prior notice to Plaintiffs and without following the protocols for contested transactions. In each instance, the funds were identifiable sums in specific accounts that rightfully belonged to Plaintiffs (either as personal funds or as corporate funds of Prime Title or Dash Title Corp. in which Plaintiffs had a direct interest).

Plaintiffs contend that Chase's actions constitute a breach of contract and violations of the standard duties of care and the Texas Uniform Commercial Code's provisions governing bank withdrawals and funds transfers.

52.     Finally, it must be emphasized that Corona's dispute concerned Dash Title Corp. only. There was no plausible basis for Chase to freeze or seize funds from Prime Title's account or Ms. Henshilwood's personal accounts in connection with that dispute. Those accounts were separate and had no ownership by Corona. Chase's decision to treat all accounts associated with Ms. Henshilwood and Mr. Jones as tainted—including by withholding Prime Title's $9,500 and debiting personal accounts to cover Dash Title Corp. reversals—was wholly unwarranted. It suggests a reckless response by Chase, where instead of carefully examining the issue, the bank lumped together unrelated accounts and penalized Plaintiffs across the board. This indiscriminate approach magnified the harm and gives rise to independent claims by each Plaintiff for the specific losses each suffered.

## V.  CAUSES OF ACTION

### COUNT I: BREACH OF CONTRACT

53.     Plaintiffs reallege and incorporate the foregoing paragraphs as if fully set forth herein.

54.     Valid contracts exist between Plaintiffs and Chase in the form of the Account Agreements governing each of Plaintiffs' accounts.

55.     Plaintiffs performed all conditions precedent under these agreements by maintaining their accounts in good standing, paying required fees, and complying with account terms.

56.     Plaintiffs contend that Chase materially breached specific provisions of the Account Agreements by:

>     a.  Processing unauthorized debits and reversals without proper authorization, violating Section III.A.6 which limits adjustments to actual errors or discrepancies;

b.  Reversing valid payments and charging those amounts to Plaintiffs' accounts, breaching UCC Article 4 as adopted in the Account Agreements through conduct that includes but is not limited to charging Ms. Henshilwood's personal account for the $807 and $12,169.17 reversals, even though those were not authorized transactions against her account (she did not order those debits). Plaintiffs contend the Account Agreements do not allow Chase to debit an account for an item or transfer that the customer did not authorize, yet Chase did exactly that, multiple times. Each such instance – $31,127.52, $807.00, $1,407.27, $12,169.17, etc. – was a breach of the deposit contract terms;

c.  Failing to properly verify Corona's claimed equity transfer through documentation required by the agreements for business account modifications that are required by Texas corporations;

d.  Improperly freezing and closing accounts without cause and without following required notice procedures. The agreements generally permit a bank to freeze or close an account in instances of suspected fraud or unauthorized activity *on that account*.  Here, for instance, Prime Title's account was closed due to a dispute unrelated to Prime Title, and personal accounts were restricted due to claims on a different business's accounts. Plaintiffs contend there was no breach or misuse of Prime Title's account by its owner that would justify non-payment of the balance upon closing. Chase's retention of $9,500 from Prime Title's account violates the fundamental contractual promise that depositor funds will be returned to the depositor. Similarly, Chase's blocking of Plaintiffs' access to accounts (including online access) without cause impeded Plaintiffs' ability to utilize services they had paid for and expected under the contracts;

e.  Failing to investigate all errors reported by Plaintiffs within the 10-business-day timeframe required by Section III.D.5;

f.  Failing to exercise ordinary care in handling Plaintiffs' accounts as required by the agreements and UCC § 4-103;

g.  On information and belief, apparently removing Plaintiffs as authorized signers without any notice, violating fundamental notice provisions and the contractual duty of good faith and any notice requirements in the Account Agreements. While the Account Agreements allow Chase to act on proper instructions, they do not permit undisclosed changes that fundamentally affect the customer relationship without at least subsequent notice. Chase's omission of any notice stating that (on information and belief) Plaintiffs had been removed as signatories, violated the reasonable expectations under the contracts—for example, the Account Agreement provides that account statements or alerts will be provided for account activity, yet Chase gave no timely prior statement or  prior warning that tens of thousands of dollars were being/would be removed at Corona's request;

h.  Failing to maintain the security and integrity of Plaintiffs' accounts, to follow the authorized instructions of the account holders and their designated signers, and to

exercise its discretionary powers in good faith and in accordance with commercially reasonable standards.  Chase agreed it would rely on the authority of designated account signers until it received proper written notice of revocation, and the agreements implicitly and explicitly required that any changes to account ownership or signatories be supported by valid documentation. Chase further had a duty under the Uniform Commercial Code (as incorporated into the Account Agreements) to honor only those withdrawals or debits that were "properly payable" (i.e., authorized by the customer or allowed by the contract) and to refrain from charging customers' accounts for items or orders not authorized by the customer. *See* Tex. Bus. & Com. Code § 4.401(a). In addition, Texas law imposes an obligation of good faith in the performance of contracts governed by the UCC. *See* Tex. Bus. & Com. Code § 1.304;

i.  Failing to act in good faith and with due care. For instance, on information and belief, Chase apparently accepted transactions from Plaintiffs after it had constructively or actually removed Plaintiffs as signatories, knowing they would be reversed, constituting a breach of the implied covenant of good faith and fair dealing. Further, Chase's overall handling of Plaintiffs' accounts lacked good faith and fair dealing. Good faith under the UCC means honesty in fact and observance of reasonable commercial standards. Plaintiffs contend on information and belief, that Chase violated this by, *inter alia*: accepting Corona's claims which could not constitute a proper transfer of equity of a Texas corporation and were contrary to the information provided by Plaintiffs; ignoring clear red flags; refusing to investigate or meaningfully investigate when Plaintiffs alerted the bank to errors; and persistently favoring an adverse third party's claims over its long-time customers' rights. These acts and omissions fall short of commercially reasonable banking standards and thus breach the contractual duty of good faith performance.

57.    As a direct and proximate result of Chase's breaches, Plaintiffs suffered damages exceeding $100,000, including wrongfully withdrawn funds, consequential damages, and lost business opportunities.  Plaintiffs lost of use of those funds for significant periods, returned payment fees and penalties (such as those related to the IRS payment and other returned items), and other consequential losses. Additionally, Plaintiffs incurred costs in attempting to resolve the issues (including professional fees to accountants or attorneys in addressing the fallout). Plaintiffs' actual economic damages caused by Chase's breach are ongoing and currently estimated well above the jurisdictional threshold of $75,000. Plaintiffs seek to recover all such damages to place them in the position they would have been in had Chase honored its contractual obligations.

58.     Pursuant to Texas Civil Practice & Remedies Code § 38.001(8), Plaintiffs further seek their reasonable and necessary attorneys' fees and costs incurred in prosecuting this breach of contract claim, as this is a claim for breach of written contracts such as the Account Agreements. Plaintiffs have fulfilled all conditions precedent to recovering such fees, including making a demand for payment on Chase more than 30 days before filing this suit (Chase having failed to tender the amount owed within 30 days). An award of fees is additionally appropriate under any fee-shifting provisions that may be contained in the agreements between the parties or under applicable law.

## COUNT II: VIOLATIONS OF THE ELECTRONIC FUND TRANSFER ACT (15 U.S.C. § 1693 et seq.)

59.     Plaintiffs reallege and incorporate the foregoing paragraphs as if fully set forth herein.

60.     The Electronic Fund Transfer Act ("EFTA") applies to electronic fund transfers involving consumer accounts. Plaintiffs' personal accounts (including Private Client Account ****6963). The debits from Plaintiffs' consumer accounts described above constitute "electronic fund transfers" as defined by 15 U.S.C. § 1693a(7), as they were initiated through Chase violated EFTA by:

a.  **Failure to limit liability (15 U.S.C. § 1693g):** On information and belief, Plaintiffs contend that Chase violated the EFTA by holding Plaintiffs liable for unauthorized transfers totaling over $75,000 from their consumer accounts despite Plaintiffs providing notice of the unauthorized nature within two business days of discovering them (e.g., dates including approximately September 27-29, 2024);

b.  **Failure to investigate (15 U.S.C. § 1693f(a)):** On information and belief, Plaintiffs contend that Chase may have failed (one or more times) to investigate reported errors within ten business days after receiving notice, including notice on or about September 29, 2024, as required by Section 5 of the Deposit Account Agreement;

c.  **Failure to provisionally recredit (15 U.S.C. § 1693f(c)):** On information and belief, Plaintiffs contend that Chase failed to provisionally recredit (at least one or more times) Plaintiffs' accounts within ten business days when investigation

exceeded ten days—for instance, by way of example only and not of limitation, the Prime Title account amounts;

d. **Failure to provide written explanation (15 U.S.C. § 1693f(d)):** On information and belief, Plaintiffs contend that Chase failed (one or more times) to provide written explanation of findings or adequate written explanation of finding within three business days of completing any investigation.

61.    Plaintiffs contend these violations were willful, as evidenced by Chase's continued processing of unauthorized transfers after receiving notice, on information and belief—its concealment of apparent removal of Plaintiffs as signatories, and its lengthy delay (many weeks) in responding to Plaintiffs' formal demand letter.

62.    Plaintiffs are entitled to actual damages, statutory damages of $1,000 per violation, and attorneys' fees under 15 U.S.C. § 1693m.

## COUNT III: NEGLIGENCE AND GROSS NEGLIGENCE

63.    Plaintiffs reallege and incorporate the foregoing paragraphs as if fully set forth herein.

64.    Chase owed Plaintiffs a duty to exercise ordinary care in handling their accounts, including duties to:

a.    Verify the identity and authority of persons seeking to modify account access;

b.    Implement reasonable security measures to prevent unauthorized account access;

c.    Conduct proper investigations into reported unauthorized transactions;

d.    Follow banking industry standards for account modifications;

e.    Provide notice of material changes to account status.

65.    Additionally, at all relevant times, Chase owed Plaintiffs a duty to exercise ordinary care and act in a reasonably prudent manner in handling their bank accounts and transactions. This duty arises from the nature of the bank-customer relationship and is reflected in the UCC and

common law. Chase had a duty, among other things, to verify significant claims or changes affecting Plaintiffs' accounts, to prevent unauthorized access or transactions, and to safeguard Plaintiffs' funds from improper removal. Even apart from contractual obligations, a financial institution must act with the care that an ordinarily prudent bank would use in similar circumstances. Additionally, once Chase undertook to investigate Plaintiffs' reports of unauthorized activity—to the extent it did so, if at all—it assumed a duty to do so with reasonable care so as not to worsen the harm.

66.    Plaintiffs contend that Chase breached these duties through acts and omissions including:

    a.  Negligently accepting Corona's improper claim of sole ownership without requesting required documentation and/or without performing minimal verification to check for the documents required by a Texas corporation to transfer equity. A prudent bank in Chase's position would have at least contacted the existing authorized signers (Henshilwood or Jones) upon receiving a claim of ownership change, especially where the claimed new owner (Corona) was known to be involved in a disputed buyout. A prudent bank would also require conclusive documentation (e.g., a certified board resolution, proof of purchase, equity transfer agreements, purchase agreements) before removing long-established account signers (including Jones, who did not sign any corporate resolution and was still an officer of Dash Title Corp.), especially considering that a Texas corporation cannot effect an equity transfer through a corporate resolution alone. This lack of due diligence falls below any reasonable standard of care in banking;

    b.  Negligently executing reversals/withdrawals. Chase acted negligently in reversing transactions and debiting accounts as described earlier. For instance, reversing a completed wire from a customer's external account is highly unusual and risky – a careful bank would confirm the legitimacy of any such reversal request and consider the customer's interest. Chase instead facilitated a reversal that drained Ms. Henshilwood's personal account at another bank, which is conduct a reasonably careful bank would not engage in absent clear authorization from the customer. Similarly, debiting a personal account to resolve disputes on a business account (or vice versa) is an improper commingling that breaches the duty of care. Each time Chase removed funds without verifying that the withdrawal was duly authorized by Plaintiffs, it breached its duty to act as a prudent custodian of the accounts;

    c.  Failing to contact Plaintiffs before—on information and belief—apparently removing them as signatories and failure to pause suspicious activity. By August

and September 2024, Chase either knew or should have known that there was a serious dispute regarding the Dash Title Corp. accounts (with Corona on one side and Plaintiffs on the other). A non-negligent bank faced with conflicting claims would typically freeze the contested account and notify all claimants to sort out the rights, or interplead funds if necessary rather than reversing and clawing back numerous transactions and causing its customers to become personally liable for debts. Here, Chase negligently failed to timely notify Plaintiffs of Corona's claims and then negligently allowed a spate of unusual transactions (large reversals, multiple cross-account debits) to go forward. Chase's internal fraud or risk controls should have flagged, for example, that on information and belief, pulling $31,000+ from a customer's personal account with a memo that was presumptively "not authorized" is irregular. The duty of care required Chase to pause and investigate rather than blindly execute Corona's directives. The bank's failure to do so was a breach of duty;

d. Processing unauthorized reversals and debits without verification;

e. Refusing to investigate (one or more times) despite Plaintiffs' repeated notices;

f. Negligently investigating and negligently responding. Once Plaintiffs alerted Chase that unauthorized withdrawals had occurred, Chase had a duty to investigate in good faith and to correct any errors. Instead, Plaintiffs contend that Chase's investigation was superficial and outcome-oriented in favor of Corona. Plaintiffs further contend that the bank negligently ignored the evidence Plaintiffs provided (such as corporate bylaws and lack of a stock transfer) and refused to reverse the wrongful debits. By shuttling Plaintiffs between departments and never fully addressing their claims, Chase failed to act as a reasonably careful bank would in remedying an acknowledged account error. This protracted failure aggravated Plaintiffs' losses (for example, leaving Prime Title's funds inaccessible for longer and allowing fees/interest to pile up on accounts); and

g. On information and belief, Plaintiffs contend Chase concealed their apparent removal as signatories while still accepting transactions.

67.    These breaches constitute negligence. Moreover, Chase's conduct rises to gross negligence because it involved an extreme degree of risk of financial harm to Plaintiffs, considering the probability and magnitude of potential harm, of which Chase had actual, subjective awareness given:

a. Plaintiffs' immediate and repeated notifications starting September 27, 2024;

b. The facially deficient documentation;

    c.  Chase's knowledge and possession of records showing both Corona and Henshilwood (and Jones) as authorized signers;

    d.  The large dollar amounts being withdrawn without verification;

    e.  On information and belief, Plaintiffs contend Chase's concealment of their apparent removal as signatories while allowing Plaintiffs to waste resources attempting transactions.

68.  Despite this actual awareness, Chase proceeded with conscious indifference to Plaintiffs' rights and welfare, continuing to process Corona's instructions and actively concealing material information.

69.  Chase's negligence was a proximate and producing cause of Plaintiffs' injuries. The harm to Plaintiffs was foreseeable. Indeed, the very purpose of verification procedures is to prevent exactly the kind of harm that occurred here. Plaintiffs have suffered damages including the loss of funds (detailed above), loss of the use of those funds (interest and opportunity cost), damage to business operations (Prime Title was deprived of operating capital), and damage to reputation and credit (e.g., the dishonor of the IRS payment and on information and belief, blemishes on Plaintiffs' banking record with Chase due to account closures and returned items). These damages flowed directly from Chase's breaches of duty. Had Chase exercised reasonable care at any of several critical junctures, the losses could have been avoided or significantly mitigated.

70.  Chase's negligence and gross negligence proximately caused damages distinct from any contractual damages, including:

    a.  Mental anguish from the sudden financial crisis;

    b.  Damage to credit ratings affecting their ability to obtain credit;

    c.  Lost business opportunities from the closure of Prime Title Agency accounts; and

    d.  Cascading financial consequences including IRS penalties and increased borrowing costs.

71.     Furthermore, the conduct of Chase described above amounted to gross negligence under Texas law. Gross negligence involves an act or omission that, when viewed objectively, entails an extreme degree of risk of harming others, combined with a subjective awareness of the risk and a conscious indifference to the rights, safety, or welfare of those affected. *See* Tex. Civ. Prac. & Rem. Code § 41.001(11) (defining gross negligence). In this case, Chase's actions meet that definition:

> a.   **Extreme Risk:** Objectively, Chase's manner of handling Plaintiffs' accounts carried a high probability of financial devastation to Plaintiffs. Removing access to substantial business and personal funds without notice, and then siphoning off large sums, created an extreme degree of risk of harm to Plaintiffs' financial stability. For example, bouncing a $16,000 IRS payment due to an unjustified account debit poses not just monetary loss but potential legal consequences. Shutting down an active business account (Prime Title's) and withholding funds could cripple that business. These are not minor or routine errors; they are actions fraught with severe repercussions.

> b.   **Actual Awareness and Conscious Indifference:** Upon information and belief, Chase (through its officers or managerial employees) was subjectively aware of the risk and illegitimacy of what it was doing, which is why it repeatedly told Plaintiffs that the accounts were frozen and due to an investigation, it would not provide information. By late September 2024, if not earlier, Plaintiffs contend that Chase knew at minimum from many phone calls and meetings that Plaintiffs vehemently disputed Corona's authority and had provided evidence calling her claims into question. Yet, despite this awareness, the evidence may show that Chase's upper management or relevant decision-makers chose to persist in the same course, favoring Corona and shutting down Plaintiffs' pleas. The fact that Chase took the drastic step of closing accounts and holding money even after formal protests, complaints and demands indicates a conscious indifference. This goes beyond mere carelessness to constitute a heedless and wanton disregard of Plaintiffs' rights.

72.     For gross negligence, Plaintiffs seek exemplary damages under Texas Civil Practice & Remedies Code § 41.003. Exemplary damages are warranted here to punish and deter such egregious misconduct by a financial institution. Chase's actions constituted a pattern of reckless disregard for its customers over a period of months as can be seen in the numerous reversed, clawed back, and retained transactions listed above. Under Texas Civil Practice & Remedies Code § 41.003(a)(3), Plaintiffs request that the trier of fact award exemplary damages in an amount

sufficient to make an example of Chase and to deter similar conduct by Chase or other banks in the future.

### COUNT IV: VIOLATIONS OF TEXAS DECEPTIVE TRADE PRACTICES ACT

73.    Plaintiffs reallege and incorporate the foregoing paragraphs as if fully set forth herein.

74.    Plaintiffs are consumers under Tex. Bus. & Com. Code § 17.45(4) as they sought and acquired banking services from Chase by purchase. Plaintiffs specifically relied on Chase's representations about account security and service quality when selecting Chase Private Client services. Chase committed multiple DTPA violations that were a producing cause of Plaintiffs' damages:

### A.  <u>Misrepresentations (Tex. Bus. & Com. Code § 17.46(b))</u>

75.    Chase made the following false, misleading, or deceptive acts with the requisite particularity:

#### a. § 17.46(b)(5) - False Representation of Service Characteristics:

- **Who:** Chase, through its marketing materials and account representatives

- **What:** Represented that Chase Private Client services included enhanced security and dedicated support

- **When:** At account opening and throughout the banking relationship

- **Where:** Chase branches in Houston, Texas and online at chase.com

- **How it was false:** Plaintiff contend Chase failed to implement basic verification procedures, allowing Corona to take control without proper documentation required to demonstrate completed equity transfer of a Texas corporation

#### b. § 17.46(b)(7) - Misrepresentation of Service Standard:

- **Who:** Chase Private Client representatives at Houston branches

- **What:** Represented premium banking services with dedicated banker support

- **When:** Throughout 2023-2024 banking relationship

- **Where:** Chase Private Client centers in Houston

- **How it was false:** Plaintiffs contend that when a crisis arose in September through October 2024, Chase provided no meaningful information or support despite dozens of hours of calls

### c. § 17.46(b)(12) - False Representation of Agreement Rights:

- **Who:** Chase representatives handling the disputed transactions

- **What:** Claimed authority to debit accounts based on Corona's improper claims

- **When:** Approximately September 27, 2024 through at least October 8, 2024 and potentially thereafter

- **Where:** Phone calls and written correspondence

- **How it was false:** Plaintiffs contend that account agreements do not appear to permit debits based on noncompliant third-party ownership claims

### d. § 17.46(b)(24) - Failure to Disclose Material Information:

- **Who:** Chase branch personnel and phone representatives

- **What:** Failed to timely or contemporaneously disclose that Plaintiffs Henshilwood and Jones had apparently been removed as signatories

- **When:** During multiple branch visits and calls from approximately September through at least December 2024

- **Where:** Chase branches in Houston and via Chase customer service lines

- **How it harmed:** Plaintiffs contend that they wasted resources attempting transactions and explaining their position, unaware that on information and belief, Chase had apparently already removed them

## B.  Unconscionable Actions (Tex. Bus. & Com. Code § 17.45(5), 17.50)

76.   Plaintiffs contend Chase engaged in unconscionable actions by taking advantage of Plaintiffs to a grossly unfair degree:

a.   Exploiting the disparity in bargaining power and information asymmetry;

b.   Refusing any meaningful dispute resolution process while holding tens of thousands of dollars;

c.   Locking online access while continuing to charge monthly fees;

d.   Closing Prime Title Agency accounts and retaining moneys based on unrelated Dash Title Corp. allegations;

e.   On information and belief, concealing the apparent removal of Plaintiffs as signatories and instead calling it account "freezing" due only to "investigations," causing Plaintiffs to waste time and resources.

77.   Plaintiffs provided DTPA notice via their December 19, 2024, demand letter sent to Chase. More than 60 days have elapsed without a reasonable settlement offer.

78.   Due to Chase's knowing and intentional conduct, including its deliberate concealment of material facts, Plaintiffs seek treble damages under Tex. Bus. & Com. Code § 17.50(b)(1). Additionally, because the unconscionable actions constitute a producing cause of economic damages or damages for mental anguish, Plaintiffs seek these damages as well; and in particular, Plaintiffs Henshilwood and Jones contend that the unconscionable conduct was committed knowingly, thus justifying their recovery for mental anguish. Tex. Bus. & Com. Code § 17.50(a)-(b).

**COUNT V: WIRE TRANSFER CLAIM (UCC Article 4A/Chapter 4A)**

79.   Plaintiffs reallege and incorporate the foregoing paragraphs as if fully set forth herein.

80.   Plaintiffs plead this UCC Article 4A claim in the alternative to their other causes of action to the extent those claims might cover the same subject matter. *See* Tex. Bus. & Com. Code §§ 4A.101-4A.507, also known as the "Uniform Commercial Code—Bank Deposits and Collections." Article 4A generally preempts common law claims that are inconsistent with it for funds transfer issues. Here, the primary relief sought (e.g., return of the $22,312.30) is fully consistent with Article 4A's mandate. If and to the extent any common law claim (such as negligence or conversion) is deemed in conflict with Article 4A regarding this transfer, Plaintiffs elect to proceed under Article 4A for that portion of their damages. Conversely, Article 4A does

not address, and thus does not preempt, claims related to the other account debits (e.g., internal transfer reversals, which are not wire transfers) or Chase's broader misconduct, so those common-law and contract claims stand independently. This Count is intended to ensure that Chase is held to its specific statutory duties for the wire/funds transfer component of the case.

81.     The $22,312.30 wire transfer from Dash Title Corp. Account ****1298 to Wells Fargo was a completed funds transfer governed by UCC Article 4A as adopted in Texas.  Under Tex. Bus. & Com. Code § 4A.104, a "funds transfer" includes a sequence of transactions beginning with the originator's payment order (here, Dash Title Corp./Henshilwood's order to transfer funds to Wells Fargo) and ending when the beneficiary's bank accepts the funds for the beneficiary. Chase's actions in reversing that transfer implicate its duties as both an "originating bank" and possibly an "intermediary" or "receiving bank" under the statute.

82.     While Article 4A/Chapter 4A provides the exclusive remedy for wire transfer disputes, it permits claims when a bank acts without proper authorization. Tex. Bus. & Com. Code § 4A.202. A payment order received by the receiving bank is effective as the order of the customer only if a security procedure agreed to by the customer and bank is followed, or if the order otherwise is proven to be authorized by the customer.  *Id.*  In this case, the reversal of the $22,312.30 transfer was not authorized by Plaintiffs. Ms. Henshilwood, as the originator and intended beneficiary, did not authorize Wells Fargo or Chase or any third party to return those funds once they were transferred. On information and belief, the reversal was initiated based on Corona's instruction that the transfer was "not authorized." However, Corona was not the actual originator of the payment order (Plaintiffs were), and any instruction from Corona to undo the transfer was not authorized by the true customer (Plaintiffs). Thus, the so-called "payment order" to reverse or

reclaim the $22,312.30 was unauthorized within the meaning of Article 4A/Chapter 4A of the Texas Business and Commerce Code.

83.    Under Tex. Bus. & Com. Code § 4A.204(a), if a receiving bank (here, Chase) accepts a payment order issued in the name of its customer that is not authorized, the bank is liable to the customer for the amount of the payment order (to the extent the bank cannot show an applicable security procedure was followed, which in this case it was not). That is, a bank that executes an unauthorized funds transfer must refund the money to its customer.  Chase violated Article 4A/Chapter 4A of the Texas Business and Commerce Code by failing to do so. On information and belief, Chase accepted Corona's instructions to treat the original transfer as erroneous or unauthorized and proceeded to pull back the funds. By doing so, Plaintiffs contend that Chase effectively acted on a new "payment order" to remove funds from Ms. Henshilwood's Wells Fargo account and send them back to Chase. On information and belief, this payment order was accepted and executed by Chase without Ms. Henshilwood's authorization. Therefore, Plaintiffs contend that Chase became obligated under the UCC to refund $22,312.30 to Plaintiffs.

84.    On information and belief, Plaintiffs contend that Chase's reversal of the completed wire transfer on August 21, 2024, after Wells Fargo had already received and credited the funds, was unauthorized because the transfer had been properly authorized by Plaintiffs, who on information and belief, were account signatories at the time of initiation.  Further, Plaintiffs contend on information and belief that no valid stop payment order was issued by properly authorized parties and Corona lacked corporate authority to reverse completed transfers. Chase accepted the August 19, 2024 transfer, but if, in fact, it removed Plaintiffs as signatories prior to that time, then it failed to notify them (and still accepted the transfer).

85.    Under Tex. Bus. & Com. Code § 4A.204, Chase is liable for the improperly reversed amount plus interest.

86.    Chase cannot escape liability under § 4A.202 or § 4A.203 because any security procedures in place were either not followed or were manifestly inadequate for this scenario. Plaintiffs did not agree to any security procedure that would allow a party like Corona to unilaterally reverse transactions without Plaintiffs' confirmation and certainly not without prior notice to Plaintiffs. If Chase contends that allowing Corona to issue payment instructions was part of a security procedure, such a procedure was not commercially reasonable as applied here (given that Plaintiffs contend Corona's claimed authority was in dispute and additionally, she could not have provided sufficient evidence to show an equity transfer of a Texas corporation because no such equity transfer actually occurred). In any event, Plaintiffs never agreed to let Corona have free rein to pull back funds, especially not without prior notice, and on information and belief, did not receive the callbacks, notifications, or other safeguards that a proper security procedure would involve for an unusual transaction of this nature.

87.    Pursuant to Article 4A/Chapter 4A (including § 4A.204), Chase is liable to Plaintiffs for the amount of the unauthorized transfer ($22,312.30) plus interest thereon from the date of the improper withdrawal (August 21, 2024) to the date of refund, and any incidental or consequential damages proved as a result of the wrongful dishonor of the payment order (such as fees incurred due to the loss of funds). The statute also imposes a duty on the customer to exercise ordinary care to discover such unauthorized transfers on their statement and report them within 90 days. Plaintiffs met any such duty by promptly reporting the reversal as soon as they discovered it (indeed, Plaintiffs notified Chase well within 90 days). To the extent Chase might argue this deadline was not met—which Plaintiffs deny—Chase was already fully aware of the dispute and

suffered no loss of opportunity to rectify; accordingly, there would be no loss of interest in Plaintiffs' recovery. Further, assuming *arguendo* that any loss of interest in Plaintiffs' recovery were considered, it would be eliminated by Chase's own lack of care stemming from its failure to use care in accepting Corona's order, which substantially contributed to the loss.

88.    Although Article 4A does not itself provide for attorney's fees, Plaintiffs' attorney's fees incurred in recovering the $22,312.30 may be recoverable as consequential damages under Article 4A/Chapter 4A. For example, fees incurred due to Chase's noncompliance with refund obligations should be recoverable as consequential damages. Additionally, Plaintiffs seek fees for this claim under the Account Agreements or other applicable law if available. In any event, Plaintiffs seek an award of pre-judgment interest on the $22,312.30 as provided by Article 4A/Chapter 4A, which is calculated from the date of the wrongful refund refusal.

### COUNT VI: CONVERSION (AS TO SPECIFIC, IDENTIFIED NON-WIRE FUNDS)

89.    Plaintiffs reallege and incorporate the foregoing paragraphs as if fully set forth herein.

90.    Under Texas law, conversion is the unauthorized and wrongful exercise of dominion or control over the personal property of another, to the exclusion of or inconsistent with the owner's rights. *Lack's Stores, Inc. v. Waisath*, 474 S.W.2d 444, 447 (Tex. 1971). Money may be the subject of conversion when specific, identifiable funds are wrongfully taken or withheld—not merely a failure to pay a general debt. *See Houston Nat'l Bank v. Biber*, 613 S.W.2d 771, 775–76 (Tex. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.).

91.    Texas courts recognize conversion of money where "specific chattel" is at issue—e.g., a particular, identifiable sum—and the defendant wrongfully exercises dominion over it. *See Waisath*, 474 S.W.2d at 447 (elements of conversion); *Biber*, 613 S.W.2d at 775–76 (money can

be the subject of conversion where identifiable and where there is a duty to deliver that specific money—not merely a debtor–creditor obligation).

92.     Plaintiffs had an immediate and superior right to possession of the following specific, identifiable funds, each tied to a precise date, account, and dollar amount. On information and belief, Chase wrongfully exercised dominion and control over those funds by removing or refusing to return them after demand, including the following transactions, which are presented in an approximate manner given the confusing communications and course of events:

    a.  **$31,127.52** — Reversed on or about September 27, 2024 from Plaintiffs' personal/linked transfer stream between account ending …1298 and personal account …6963.

    b.  **$807.00** — Reversed on September 30, 2024 from the Dash operating account …1298 tied to an internal payment to the Dash business card …1551; later it appears to have been treated by Chase as a discrete claim reversal on or about October 25, 2024.

    c.  **$12,169.17** — Internal payment activity associated with the Dash escrow …5682 and Chase card …1551, apparently reflected as a credit due to claim on or about October 8, 2024 (Claim No. 344991479240001) and subsequent withdrawal activity noted in November 2024.

    d.  **$1,407.27** — Debited from Plaintiffs' personal Account ****6963 on or about October 3, 2024, which Chase appears to later acknowledge in a December 20, 2024 letter regarding a September 19, 2024 credit

    e.  **$31,127.52** — Withdrawn again from Account ****6963 on or about October 8, 2024, which Chase's own records apparently identify as a "credit due to claim"

    f.  **$12,169.17** — Withdrawn from Account ****6963 on or about October 8, 2024, which Chase's own records identify as a "credit due to claim";

    g.  **$807.00** — Removed from Account ****6963 after October 25, 2024, following Chase's apparent claim decision dated October 17, 2024; and

    h.  **$9,500.00** — Withheld from Prime Title Agency, Inc. savings …7831 (with a separate cashier's check refund of $12,491.57 issued on November 19, 2024 while the $9,500 remained withheld), an entity wholly owned by Henshilwood and a partner and with which Corona had no connection.

93.    Plaintiffs made repeated in-person and telephonic demands to Chase for return of these specific sums, believe they may have made written demands or requests as well, and through counsel sent a comprehensive, written demand letter on December 19, 2024, again demanding recredit/return. Chase failed and refused to return the funds.

94.    These identified sums are capable of precise segregation and tracing, and Chase's refusal to recredit/return them after demand constitutes conversion under Texas law. *See Waisath*, 474 S.W.2d at 447; *Biber*, 613 S.W.2d at 775–76.

95.    This conversion count does not challenge any wire-transfer conduct, including the August 2024 $22,312.30 wire/reversal. Allegations concerning wires are brought under contract/UCC Article 4A/Tex. Bus. & Comm. Code Chapter 4A and not as conversion, to avoid Article 4A/Chapter 4A displacement. *See Moody Nat'l Bank v. Texas City Dev. Ltd.*, 46 S.W.3d 373, 377–78 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (stating that "Article 4A has never been interpreted to preempt *all* common law claims; it is intended only to bar those claims that would be inconsistent with any of the article's provisions.")

96.    Chase's exercise of dominion over these specific, identifiable funds was wrongful because (a) Corona had no authority over Plaintiffs' personal accounts; (b) Corona had no connection whatsoever to Prime Title Agency; (c) Chase failed to verify any legitimate basis for seizing these funds; and/or (d) Chase acted on noncompliant third-party claims (i.e., a Texas corporation must have a Board resolution plus a legal transfer mechanism such as a transfer/purchase agreement to transfer equity and this did not exist because no equity transfer transaction ever closed) without proper investigation.

97.    The duty not to wrongfully exercise dominion over another's specific property exists independently of any deposit agreements; making this claim distinct from Plaintiffs' breach of

contract claims and seeking enforcement of Plaintiffs' immediate possessory rights in identified funds. *See generally Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46–47 (Tex. 1998) (recognizing independent tort duties).

98.    Chase affirmatively removed or withheld discrete, claim-tied amounts (e.g., $31,127.52, $807, $12,169.17, $1,407.27, and $9,500) and then refused to return them on demand—classic dominion over identified funds, not a mere failure to pay a general debt.

99.    As a direct and proximate result of Chase's conversion, Plaintiffs suffered damages in at least the amounts of the converted funds, plus consequential damages and pre- and post-judgment interest as allowed by law.

## VI. **DAMAGES**

100.    As a direct and proximate result of Chase's conduct, Plaintiffs have suffered damages including (a) Economic damages due to wrongfully withdraw/withheld funds, IRS payment rejection penalties and interest, damage to bank history, lost business income (Prime Title Agency), and additional fees and charges; (b) mental anguish damages (tied to gross negligence and DTPA claims only) based on severe emotional distress from sudden financial catastrophe caused by Chase's conscious indifference, anxiety and sleeplessness from inability to meet financial obligations including IRS payments, and humiliation and distress from damage to business and personal reputation in the community; (c) statutory damages under the EFTA for $1,000 per violation and the DTPA for treble economic and mental anguish damages, and (d) exemplary damages arising from gross negligence demonstrating conscious indifference.

## VII. **CONDITIONS PRECEDENT**

101.    All conditions precedent to Plaintiffs' claims for relief have been performed, have occurred, or have been waived. This includes, without limitation, the provision of any required

pre-suit notice or demand to Chase. Plaintiffs made a written demand on Chase on December 19, 2024 for return of the funds and compliance with the law, and more than 60 days have elapsed since that demand with no satisfactory response. Any other procedural prerequisites (such as dispute resolution steps in the Account Agreements, if enforceable) have been satisfied or Chase has waived strict compliance by its refusal to remedy the situation.

## VIII. <u>DEMAND FOR JURY TRIAL</u>

102.    Plaintiffs demand a trial by jury on all claims so triable.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request that this Court:

    A.  Enter judgment in favor of Plaintiffs and against Defendant on all claims;

    B.  Award actual damages as calculated;

    C.  Award statutory damages under EFTA;

    D.  Award treble damages under the Texas DTPA;

    E.  Award exemplary damages for gross negligence;

    F.  Award pre- and post-judgment interest at the maximum legal rate;

    G.  Award attorneys' fees and costs;

    H.  Grant such other and further relief as the Court deems just and proper.

Dated: August 29, 2025                    Respectfully submitted,

                                          **HENDERSHOT COWART, PC**

                                          */s/ Philip D. Racusin*
                                          SIMON W. HENDERSHOT, III
                                          SBN: 09417200
                                          trey@hchlawyers.com
                                          PHILIP D. RACUSIN
                                          SBN: 24054267
                                          pracusin@hchlawyers.com
                                          1800 Bering Drive, Suite 600
                                          Houston, Texas 77057
                                          T: 713-783-3110
                                          F: 713-783-2809

                                          **ATTORNEYS FOR PLAINTIFFS**


                          **<u>CERTIFICATE OF SERVICE</u>**

        The undersigned certifies that on August 29, 2025, a true and correct copy of the foregoing instrument via the Court's CM/ECF system, and that all counsel of record were served an electronic copy pursuant to the Federal Rules of Civil Procedure.


                                          */s/ Philip D. Racusin*
                                          PHILIP D. RACUSIN



4902-4617-7635, v. 5